UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KIM TILLOTSON,

Plaintiff, Case No. 15-cv-14479

v. Honorable Thomas L. Ludington

THE MANITOWAC COMPANY, INC.,

Defendants.
_______________________________________/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING MOTION FOR PROTECTIVE ORDER AND MOTION ADJOURN AS MOOT**

Plaintiff Kim Tillotson filed a complaint naming his former employer, The Manitowoc Company, Inc., ("Manitowoc") as a Defendant[1] and alleging violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and the Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2201, *et seq.* ECF No. 1. On January 6, 2016, eight days later, Tillotson filed an amended complaint, which brought the same two claims.[2] ECF No. 4. Manitowoc responded with a motion for summary judgment, ECF No. 29, and three weeks later filed a motion for a protective order, ECF No. 32. In the motion for a protective order, Manitowoc seeks to prevent Tillotson from deposing a witness after the close of discovery. Tillotson then filed a motion to adjourn the trial on January 24, 2017. ECF No. 40. For the reasons stated below, Manitowoc's motion for summary judgment will be granted. Because they are moot, the motion for a protective order and motion to adjourn trial will be denied.

---

[1] Tillotson also named Matrix Absence Management, Inc., as a Defendant. Matrix handled certain human relations functions for The Manitowoc Company. The parties stipulated to the dismissal of Matrix on March 2, 2016. ECF No. 13.

[2] The two complaints appear substantially similar. The only immediately obvious differences are minor changes in the caption and in the formatting.

**I.**

The facts of the case are to be be construed in the light most favorable to Tillotson in addressing Manitowoc's motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Plaintiff Kim Tillotson was hired by The Delfield Company, LLC, in 1983. Tillotson Dep. at 9–10, ECF No. 29, Ex. 1. The Delfield Company, LLC, was a subsidiary of Enodis PLC at the time. Greenberg Decl., ECF No. 29, Ex. 4. In 2008, The Manitowoc Company, Inc., acquired Enodis and all its subsidiaries, including The Delfield Company, LLC. *Id.* The Delfield Company, LLC, was organized as a subsidiary of Manitowoc Foodservice, Inc., which was owned by The Manitowoc Company, Inc. *Id.* On March 4, 2016, several months after this case was filed, The Manitowoc Company, Inc., separated from Manitowoc Foodservice, Inc. *Id.* The Manitowoc Company, Inc., is the named Defendant in this case.

Since being hired, Tillotson has held several positions within the company.[3] Although Tillotson began as a customer services representative, he became a sales engineer after about ten years. *Id.* at 24–25. In approximately May of 2003, Tillotson became an internal sales manager. *Id.* at 26. In 2013, Tillotson changed jobs again, becoming a product sales manager. *Id.* at 29. Product sales managers are assigned territories and are responsible for generating business within those regions. *Id.* at 30.

**A.**

When Tillotson first started as a product sales manager, his supervisor, Bill Hoffman, did not immediately assign Tillotson a sales territory. Tillotson Dep. at 33. Rather, Mr. Hoffman gave Tillotson time to learn the position. During that period, Tillotson "filled in wherever . . . needed." *Id.* at 32. After approximately one month, Tillotson was assigned a territory consisting

[3] Although the pleadings and briefing does not indicate what kind of products Delfield sells, the company's website reveals that it sells a variety of commercial food service equipment. *See* http://www.delfield.com/.

of Louisiana, Tennessee, and California. *Id.* at 34. Tillotson's territory was not geographically contiguous because product sales manager responsibilities were defined by the assigned sales persons, not necessarily geographic regions. *Id.* When assigned this region, Tillotson spent approximately 30 percent of his time traveling. *Id.* at 35. Over time, the work load increased, and during busy seasons Tillotson spent up to 45 percent of his time traveling. *Id.* at 37. Most of Tillotson's flights during this time were two hours in length.[4] *Id.* Flights to California took four hours. *Id.* at 38. Tillotson would also attend trade shows and conferences around the country several times a year. *Id.* at 38–39. Mr. Hoffman evaluated Tillotson's performance at the end of 2013. 2013 Eval., ECF No. 31, Ex. 3. Mr. Hoffman's comments and conclusions were uniformly positive. *Id.* Tillotson's "manager calculated overall ranking" was "significantly exceeds calculations," while Tillotson's overall "manager's rating" was "meets all expectations, exceeds some." *Id.*[5]

In January of 2015, Tim Wilczak became Tillotson's new supervisor. *Id.* at 39. Mr. Wilczak gave Tillotson an annual performance review for 2014. 2014 Eval., ECF No. 31, Ex. 5. The "manger calculated overall rating" and "manager's rating" for 2014 were identical: "meets all expectations, exceeds some." *Id.* Besides Tillotson, Jeff Michael and Pam Sharrar were also serving as product sales managers during this time. *Id.* Because Ms. Sharrar was inexperienced, she did not have an assigned territory at this point. *Id.* After Mr. Wilczak became Tillotson's supervisor, Tillotson's sales responsibilities changed. *Id.* at 41. Tillotson volunteered to handle Delfield's two largest territories, which covered clients in Indiana, Michigan, Ohio, Georgia, and Tennessee. *Id.* at 41–43. Jeff Michael opposed grouping those territories together, arguing that

[4] Tillotson currently resides in Isabella County, Michigan. The record does not indicate whether Tillotson lived in Michigan for all relevant periods.

[5] The difference between the "manager calculated overall rating" and the "manager's rating" is unclear. When asked about the distinction between the two ratings during his deposition, Mr. Hoffman acknowledged that he no longer remembered the difference. Hoffman Dep. at 8, ECF No. 29, Ex. 2.

the combined territories were too large for one person to effectively handle. *Id.* at 41. Tillotson told Mr. Michael that he wanted the new assignment because it would reduce his travel distance. *Id.* at 41–42. Tillotson acknowledges that he did not tell anyone that he did not want to continue traveling to California. He also specifically denies telling anyone that he needed to make the change in assignments for medical reasons. *Id.* After switching territories, Tillotson's flights lasted no more than two or two and one-half hours, with the exception of one flight to California. *Id.* at 42–43. During this time period, Tillotson did not disclose the medical issues he was suffering from to Delfield. *Id.* at 44.[6] In Tillotson's own words, "I did my job duties to the best of my abilities and hid everything." *Id.*

**B.**

Even though he had not disclosed them openly to Delfield, Tillotson had been struggling with certain medical issues for some time. Tillotson's primary medical condition is referred to as "dumping syndrome." *Id.* at 65. The condition originated in the 1980s, when Tillotson had surgery to correct a stomach ulcer. *Id.* at 45. Unbeknownst to Tillotson, the surgeon accidentally damaged the vagus nerves in his stomach. *Id.* Because of that damage, Tillotson's food moves through his intestines quickly, sometime as soon as ten minutes after eating. *Id.* at 76. Tillotson can feel normal for days or weeks at a time, and then have weeks where he is forced to use the restroom up to eight times a day. *Id.* at 75–76. Tillotson also experiences heart palpitations, which he believes are connected to the dumping syndrome. *Id.* at 66. Tillotson takes dicyclomine to soothe his intestinal track. *Id.* at 76. He also takes duloxetine for depression and anxiety. *Id.*

**C.**

[6] Tillotson testified that he told Bill Hoffman, a previous supervisor, that he was having stomach issues sometime in 2012. *Id.* at 49, 82. He also at some point told co-workers Jeff Michaels and Pam Sharrar about his medical problems. *Id.* It is unclear when, exactly, he disclosed this information. It is also unclear how detailed Tillotson's disclosures were.

When Mr. Wilczak took over from Mr. Hoffman as his supervisor, Tillotson's workload increased. Tillotson Dep. at 36–37. He believed that, given his medical issues, he could not maintain the increased schedule. *Id.* at 71. He also believed that the severity of his symptoms was due, in part, to the stress of his responsibilities. *Id.* at 70. At some point in 2014, Tillotson talked briefly with Kevin Humphreys, a human resources representative, about his medical problems. *Id.* at 84–85. Mr. Humphreys provided Tillotson some information about requesting medical leave, but Tillotson did not take any action during 2014. *Id.* In January 2015, Tillotson spoke with Mr. Humphreys again. *Id.* at 85. According to Mr. Humphreys, Tillotson stated that his medical issues were "flaring up" and that "he was having a tough time getting on top of it." Humphreys Dep. at 9, ECF No. 31, Ex. 6. Mr. Humphreys told Tillotson that he should document his medical issues and contact Matrix Absence Management, Inc. ("Matrix"), a third-party company that The Manitowoc Company had contracted with to handle applications for leaves of absence. *Id.* at 10.

On February 14, 2015, Tillotson submitted a leave request to Matrix. Leave Request, ECF No. 31, Ex. 7. Tillotson Dep. at 68. Tillotson testified that his intent was to protect his rights under the FMLA and determine if he was qualified for disability or other benefits. *Id.* The request stated that Tillotson's "last day of work" would be February 26, 2015. Leave Request at 1. Tillotson also stated that he was not requesting intermittent or part-time leave. *Id.* In his deposition, Tillotson testified that, despite the representations he made on the leave request, he was primarily seeking to begin a dialogue with the company about his medical issues rather than requesting a specific amount of leave. Tillotson Dep. at 68–70. In a conversation with his doctor, Tillotson stated that he could not financially afford to stop traveling completely, despite his

doctor's recommendation that he cease all traveling. *Id.* at 72. Rather, Tillotson asked his doctor to report that he was only partially disabled so that he could stay employed. *Id.*

On February 18, 2015, Matrix notified Tillotson that his request had been received and that Tillotson was potentially eligible for leave under the FMLA, with final approval dependent on medical certification of his serious health condition. Matrix Feb. 18, 2015, Letter, ECF No. 31, Ex. 8. The letter further stated that "[i]f the Certification of Health Care Provider form does not contain sufficient information to approve your absence, Matrix will return it to you with a request for additional information." *Id.* at 2.

On February 23, 2015, Dr. Scott Vogel submitted a medical certification form to Matrix. Vogel Cert., ECF No. 31, Ex. 9. Dr. Vogel indicated that Tillotson was suffering from dumping syndrome and that he had achieved "maximum medical improvement." *Id.* at 2. Dr. Vogel further stated that Tillotson's medical condition would continue indefinitely. *Id.* at 3. He recommended the following work restrictions: "No prolonged travel or activities greater than 1-2 hours w/o ability to take a bathroom break." *Id.* The form did not indicate that Tillotson required leave or otherwise recommend immediate action.

On February 26, 2015, Matrix sent Tillotson a letter denying his request for FMLA leave "because the health care provider completing your leave certification form did not certify the leave as being related to a serious health condition." Matrix Feb. 26, 2015, Letter, ECF No. 31, Ex. 10. Matrix's internal records further provide that the FMLA request was denied because the medical certification did not support a level of impairment that would prevent Tillotson from performing his job and Dr. Vogel did not indicate that Tillotson was incapable of working. Matrix Records at 22, ECF No. 29, Ex. 6A. Several weeks later, Tillotson's request for short-term disability benefits was also denied by Matrix. Tillotson Dep. at 123.

On April 27, 2015, Dr. Vogel issued new work restrictions for Tillotson:

> Patient should not travel more than 2 hours, and should not exceed 8 days away from home per month. These days away from home should not eceed [sic] 8 consecutive days. Travel of longer distances should be limited to 3 days per quarter. No prolonged travel or activities of greater than 1 to 2 hours without having a bathroom break.

Vogel April 27, 2015, Eval., ECF No. 31, Ex. 12.

Tillotson provided Dr. Vogel's updated recommendations to Mr. Humphreys, who scheduled a meeting with Tillotson and Mr. Wilczak. At that meeting, Tillotson presented Dr. Vogel's updated restrictions. Tillotson Dep. at 129–130. The three decided that no immediate adjustments to Tillotson's schedule or responsibilities were necessary. *Id.* at 130–31. Although Tillotson believed future changes would be necessary, it is unclear whether Mr. Wilzcak agreed. *Id.* Regardless, no changes to Tillotson's duties were made at the time, nor were any changes necessary based on Dr. Vogel's recommendation. *Id.* at 131 ("Q: So between May of 2015 and November of 2015, no adjustments or revisions had to be made to your job duties in order to fit within this plan, did they? A: That would be correct; yes.").

**D.**

In April 2015, there was a "reduction in force" at both the Manitowoc Food Service, Inc., and The Manitowoc Company, Inc. Humphreys Dep. at 36. Tillotson appears to have been considered for discharge at that time, but his job was not eliminated. *Id.* at 36–37. Although the precise timeline is unclear, it appears that the decision to retain Tillotson through the April 2015 reduction was made before Tillotson disclosed the details of his travel restrictions to Mr. Wilzcak. After the May 2015 meeting, Mr. Wilczak reported the details of his conversation with Tillotson about potential work limitations to Mr. Willoughby, the Vice President of Sales for Manitowoc Foodservice, Inc. Wilczak Dep. at 30.

Around the same time, Mr. Humphreys walked past Mr. Wilzcak's office and overheard an "unpleasant" phone conversation. Humphreys Dep. at 26. After the call, Mr. Humphreys asked Mr. Wilzcak how he was doing. *Id.* Mr. Wilzcak told Mr. Humphreys that he had just talked to Mr. Willoughby and that Mr. Willoughby was not happy. *Id.* When Mr. Humphreys asked what the problem was, Mr. Wilzcak explained that Tillotson had been the subject of the phone call. *Id.* at 26–27. According to Mr. Wilczak, Mr. Willoughby said "you can't have a sales guy who can't travel." *Id.* at 27. Mr. Humphreys contested that idea, reminding Mr. Wilczak that the two of them had agreed with Tillotson that they "could make [the travel restrictions] work." *Id.* Mr. Wilczak then told Mr. Humphreys that he had told Mr. Willoughby the same thing, but that Mr. Willoughby had replied, "we'll go with this for now." *Id.*

Later in the summer of 2015, Mr. Humphreys learned that the company was considering another reduction in force and that Tillotson was a candidate for discharge. *Id.* at 28. Worried that the decision-makers might not be privy to all information revealed in the May 2015 meeting with Tillotson, Mr. Humphreys called a human resources employee, Trisha Hall. *Id.* at 29. He told Ms. Hall about the meeting with Tillotson, including the fact that the no accommodations were needed to his present duties. *Id.* According to Mr. Humphreys, Ms. Hall responded: "You can't have a salesperson that can't travel." *Id.* at 30. Mr. Humphreys then reiterated that it was only a restriction on travel, not a complete ban. *Id.*

In November 2015, Mr. Willoughby called Mr. Wilczak and directed him to terminate Tillotson's employment. Wilczak Dep. at 35. According to Mr. Willoughby, there were twenty-seven product sales managers prior to the reduction in force. Willoughby Decl. at 1. During the

November 2015 reduction, eight of those managers were released, including Tillotson.[7] *Id.* Mr. Willoughby asserts that he was instructed to eliminate one of the four product sales managers at Delfield. *Id.* To decide which one was released, Mr. Willoughby analyzed Manitowoc Foodservice, Inc.'s, "9-Box" rubric. *Id.* That rubric "ranked the performance and potential of each [product sales manager]." *Id.* The 9-Box was created during Manitowoc Foodservice, Inc.'s, annual talent assessment process. *Id.* at 2.[8] To rate a product sales manager's "performance," the company considered the individual's ability to execute sales "by reviewing monthly sales targets and feedback from customers and reps." *Id.* To determine the "potential" rating, the company considered past actions that would "predict future performance/actions, focusing on whether the individual has been able to readily establish a rapport with customers and reps and solidify business relationships . . . , such that he/she can push business forward." *Id.*

According to Mr. Willoughby, at the time of the November 2015 reduction, Tillotson had the lowest ranking of the four product sales managers employed at Delfield. *Id.* Tim Wilczak had a "High Performance/High Potential" ranking. *Id.* Jeffrey Michael had a "High Performance/Medium Potential" ranking. *Id.* Pam Sharrar had a "Medium Performance/High Potential" ranking. *Id.* Tillotson had a "Medium Performance/Medium Potential" ranking. *Id.* Mr. Willougby represents that he selected Tillotson for elimination because he "believed he had the least ability to perform the work required to be performed after completion of the [reduction in force]." *Id.*

**II.**

Manitowoc has moved for summary judgment. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the

[7] According to Mr. Willoughby, sixteen of the nineteen product sales managers that were retained through the November 2015 reduction in force were age 40 or older. Willoughby Decl. at 3.

[8] The record does not specify when this annual assessment process occurred.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

**III.**

Tillotson has alleged interference with his FMLA rights and retaliation for attempting to exercise his FMLA rights. He has also alleged that Manitowoc engaged in age discrimination in violation of the ELCRA. Manitowoc seeks dismissal of Tillotson's FMLA and ELCRA claims.

The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir.2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2).

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from

§ 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The main distinction between the two theories is the employer's intent. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Id*. (quoting *Arban v. West Pub. Co*., 345 F.3d 390, 401 (6th Cir. 2003)). In contrast, the central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id*. (quoting *Edgar v. JAC Prods., Inc*., 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id*. (citing *Edgar*, 443 F.3d at 508) (emphasis original). Tillotson is bringing both FMLA interference and retaliation claims.

**A.**

As an initial matter, Manitowoc argues that it is not the proper party. Rather, the Manitowoc Company, Inc., asserts that The Delfield Company, LLC, was Tillotson's actual employer. Defendant further argues, in reliance on an affidavit provided by its in-house counsel, that its only relationship to Delfield was through its ownership of Manitowoc Foodservice, Inc., which in turn owned Delfield. Defendant argues that it cannot be held liable for any misconduct of its subsidiary. More importantly, Defendant asserts that The Manitowoc Company, Inc., sold Manitowoc Foodservice, Inc., in March 2016. Accordingly, Defendant argues that, even if it was a proper defendant at one point, it no longer owns the company which made the decision to discharge Tillotson.

Tillotson argues that his annual compensation statements and W-2 forms were sent to him by The Manitowoc Company, Inc. *See* ECF No. 31, Ex. 13, 14. He also asserts that Defendants have insufficiently supported its allegations regarding corporate structure. Tillotson further requests leave to substitute the real party in interest, should the Court find that the improper defendant has been named.

For purposes of liability under the FMLA, the Department of Labor has promulgated the "integrated employers" test. 29 C.F.R. § 825.104(c). Under that test, "[s]eparate entities will be deemed to be parts of a single employer for purposes of the FMLA" if certain factors justify treating the entities as integrated. *Id.* at § 825.104(c)(2). "Factors considered in determining whether two or more entities are an integrated employer include: (i) Common management; (ii) Interrelation between operations; (iii) Centralized control of labor relations; and (iv) Degree of common ownership/financial control." *Id.* Generally, courts find that a wholly-owned subsidiary and parent company are not an integrated employer, absent additional evidence of integration. *See Grace v. USCAR*, 521 F.3d 655, 664 (6th Cir. 2008) (collecting cases). Neither party cites the relevant regulation or any court decisions applying the test. Accordingly, neither party has indicated whether consideration of the factors demonstrates integration.

Given the limited facts available, Tillotson's suit will not be dismissed for suing the improper Defendant.[9] During the course of the relevant events, The Manitowoc Company, Inc., wholly owned Manitowoc Foodservice, which wholly owned Delfield. Thus, the fourth factor supports a finding of integration. The parties have provided few facts with any relevance to the

[9] Even though The Manitowoc Company, Inc., no longer owns Manitowoc Foodservice, Inc., the alleged FMLA violation occurred well before that ownership change occurred. Defendant has offered no legal support for the proposition that this ownership change eliminates any liability Defendant might have previously incurred. To the extent an interest has been transferred, Federal Rule of Civil Procedure 25(c) provides that "the action may be continued by or against the original party" unless the Court orders otherwise. Given the significant time already devoted to this lawsuit by Plaintiff, the Court will not order a substitution.

first three factors. However, it appears that executives from Manitowoc Foodservice, Inc., made the decision to initiate a reduction in force. It is unclear whether The Manitowoc Company, Inc., executives were involved in that decision. Similarly, leave requests for Delfield employees were "contracted out" to Matrix, but it is unclear whether Matrix handled that aspect of labor relations for The Manitowoc Company, Inc., and all subsidiaries, or only some subsidiaries. Regardless, there is some evidence of centralized control of labor relations and common management.

In short, Defendant's barebones argument that it is the improper party is insufficient. Given the dearth of relevant facts in the record, the Court is unable to determine the full extent to which The Manitowoc Company, Inc., was integrated with Manitowoc Foodservice Company, but there is some evidence of integration. For that reason, the merits of Tillotson's FMLA and ELCRA claims will be reached.

**B.**

Manitowoc first moves for summary judgment on Tillotson's claim that Manitowoc interfered with the exercise of his FMLA rights. FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter." To establish a prima facie case of interference, a plaintiff must prove that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was entitled to leave under the FMLA; (4) he gave notice of his intention to take leave to his employer; and (5) the employer denied him FMLA benefits to which he was entitled. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

**1.**

Manitowoc first argues that Tillotson is not entitled to relief because he never requested FMLA leave. "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Properties, Inc.*, 149 F.3d 517, 523 (6th Cir. 1998). However, an "employee does not have to expressly assert his right to take leave as a right under the FMLA." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999). Rather, "'[t]he critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'" *Brohm*, 149 F.3d at 523 (quoting *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758, 764 (5th Cir.1995)). In *Brohm*, the Sixth Circuit affirmed the district court's dismissal of the FMLA claim, explaining that Brohm offered "no evidence that he requested medical leave while he was employed." *Id. See also Anderson v. McIntosh Const.*, LLC, 597 F. App'x 313, 315 (6th Cir. 2015) ("[T]he FMLA places no duty on an employer to grant leave without a request or notice from an employee.").

Here, Tillotson provided notice he was seeking to exercise his FMLA rights. The leave request that Tillotson submitted to Matrix referred to the FMLA. Manitowoc cannot reasonably argue that Tillotson did not indicate an effort, at least initially, to exercise FMLA rights. An employee need not "actually mention the FMLA by name," though Tillotson did so. *Brohm*, 149 F.3d at 523. Rather, "if an employer lacks sufficient information about an employee's reason" for requesting leave, the employer should inquire further to determine whether the employee is eligible for FMLA leave. *See Nawrocki v. United Methodist Ret. Communities, Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006). Besides submitting a FMLA leave request, Tillotson also informed his supervisor that he needed a medical accommodation because of his medical condition. Manitowoc argues that Tillotson was not entitled to FMLA leave based on the

information provided to Manitowoc, but that question is separate from the question of whether Tillotson requested FMLA benefits. Tillotson submitted an FMLA leave request and notified Manitowoc of his travel restrictions, meaning he satisfied the fourth element of a prima facie FMLA interference claim.

**2.**

Manitowoc next argues that Tillotson has not established the third element of an FMLA interference claim: that he was entitled to FMLA leave. The FMLA entitles an employee to medical leave if the employee has "a serious health condition that makes the employee unable to perform the functions of the position." 29 U.S.C. § 2612(a)(1)(D). Under the FMLA, a serious health condition is "an illness, injury, impairment or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider." 29 C.F.R. § 825.113(a). "Continuing treatment" includes "chronic serious health conditions," which means conditions that require "periodic visits (defined as at least twice a year)," continue "over an extended period of time," and may "cause episodic rather than a continuing period of incapacity." 29 C.F.R. § 825.115(c)(1)–(3). Tillotson's testimony and the documentation provided his doctors suggests that his medical issues were severe. He periodically visited his doctors for evaluation. He has suffered from dumping syndrome for years. And even though he has days and weeks at a time which are relatively free of medical issues, he also has weeklong episodes where he must use the bathroom multiple times a day. Given this evidence, there is a genuine question of fact regarding whether Tillotson suffers from a serious health condition.

Manitowoc argues that, even if Tillotson's medical issues were sufficiently serious to make him eligible for FMLA protections, the medical documentation he provided to Manitowoc did not establish his inability to perform the functions of his job. Rather, Manitowoc contends

that Tillotson's representations, backed by his doctor's recommended restrictions, actually established that he was capable of performing his duties without taking leave or a reduction in his schedule. In response, Tillotson argues that he was seeking a reduced leave schedule and that, even if immediate changes to his schedule were unnecessary, they would have been necessary in the future.

The FMLA provides protections for employees which need to take "reduced schedule leave" because of a chronic serious health condition. *See* 29 C.F.R. § 825.202(b)(2). "A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek, or hours per workday." *Id.* at § 825.202(a). Typically, a "reduced leave schedule" results in the employee moving "from full-time to part-time." *Id.*

Tillotson communicated to Manitowoc that his medical condition placed certain restrictions on his ability to perform his duties. On the initial leave request that Tillotson completed and sent to Matrix, Tillotson was asked "Are you requesting Leave on an intermittent/part-time basis?" Leave Request at 1. He answered: "No." *Id.* Tillotson's doctor then submitted medical certification to Matrix. On that form, Dr. Vogel listed the following work restriction: "No prolonged travel or activities greater than 1–2 hours w/o ability to take a bathroom break." Vogel Cert. at 3. In his deposition, Tillotson admitted that he did not specifically request to take certain days off work. Tillotson Dep. at 110 ("Q: But you had not actually had any leave approved at this time; correct? A: That's correct, and I hadn't requested any. Q: You hadn't requested any? A: I hadn't requested – I hadn't said I'm leaving work because I'm ill."). When asked why he did not expressly request intermittent or part-time leave, Tillotson responded: "I didn't know what was going to be approved, so I – again I filled it out to

the best of my abilities. . . . I figured someone would be reaching out to me to discuss all this." *Id.* at 91.

After examining Tillotson in April 2015, Dr. Vogel provided more detailed work restrictions:

> Patient should not travel more than 2 hours, and should not exceed 8 days away from home per month. These days away from home should not eceed [sic] 8 consecutive days. Travel of longer distances should be limited to 3 days per quarter. No prolonged travel or activities of greater than 1 to 2 hours without having a bathroom break.

Vogel April 27, 2015, Eval.

Tillotson did not communicate these restrictions to Manitowoc until approximately May 2015, when he met with Mr. Wilzcak and Mr. Humphreys. At his deposition, Tillotson was asked: "[A]t the time of this meeting, isn't it true that the three of you discussed the fact that your current schedule was already – already fit within these parameters?" Tillotson Dep. at 130. Tillotson replied: "It was at the current time, yes." *Id.* Then, he was asked: "[D]id adjustments need to be made at some point in time?" *Id.* In response, Tillotson stated: "Most likely in the future there might be – have to be adjustments. Again that's looking to the future. Not sure." *Id.* at 131. Finally, Tillotson was asked if any "adjustments or revisions had to be made" to his job duties between May 2015 and November 2015 to comply with Dr. Vogel restrictions. *Id.* Tillotson acknowledged that his duties were consistent with Dr. Vogel's restrictions during that time period. *Id.*

When an employee requests a reduced schedule, the "employee shall advise the employer, upon request, of the reasons why the intermittent/reduced leave schedule is necessary and of the schedule for treatment, if applicable." 29 C.F.R. § 825.302(f). Further, "[t]he employee and employer shall attempt to work out a schedule for such leave that meets the

employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider." *Id.*

At his deposition, Tillotson was asked: "Did you ever at any time ask anyone at Manitowoc to move from the [product sales manager] position to another position?" *Id.* at 108. Tillotson acknowledged: "No, I did not." *Id.* Then, Tillotson was asked if he had requested any changes in his product sales manager duties. *Id.* Tillotson explained that he talked with Mr. Wilzcak about potential changes. *Id.* Tillotson took on Delfield's two largest representative groups because those groups would require less travel, but otherwise no changes were made. *Id.* Importantly, Tillotson does not indicate that he communicated to Manitowoc a desire for additional accommodations. In fact, Tillotson admits that his duties, at this point, complied with the restrictions that Dr. Vogel had recommended. *Id.* at 120–21. Manitowoc was thus under no duty to investigate Tillotson's medical condition further or provide additional accommodations. *See Nawrocki v. United Methodist Ret. Communities, Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006) (explaining that an employer is entitled to rely on the medical documentation provided by the employee, especially when the documentation provides a "negative certification" that no medical leave is necessary). Rather, the regulations quoted above place a responsibility on Tillotson to explain his medical issues to his employer and to request specific relief.

Even construing the facts in a light most favorable to Tillotson, he never requested specific days off. He never took any kind of leave without permission. In fact, he indicated in his deposition that he could not afford to stop working completely. *Id.* at 72. Tillotson did provide notice of certain medical restrictions he was under to Manitowoc. But Tillotson's duties at all times after that notice were consistent with those restrictions. Manitowoc met with Tillotson to discuss those restrictions, and Tillotson has not provided any evidence that Manitowoc would

have refused to accommodate him if it became necessary. Tillotson argues that, in the future, his responsibilities were certain to change. That may be true, but it may not. The argument merely speculates that a reduced leave schedule would be necessary in the future. Tillotson was not entitled to a reduced leave schedule in the present simply because his job duties might change in the future. Tillotson has not provided any specific examples of requests he made regarding his medical conditions that were denied.

Manitowoc thus appears to have fully accommodated Tillotson's work restrictions. Tillotson cannot reasonably argue that he was entitled to accommodations beyond those recommended by his doctor. More importantly, Tillotson has provided no legal authority for the proposition that Manitowoc interfered with his FMLA rights by not instituting, without a specific request by Tillotson, a reduced schedule based on work responsibilities which did not yet exist. Because Tillotson never requested, much less demonstrated the need for, additional accommodations to his duties, he has not established a prima facie case that Manitowoc denied him FMLA rights to which he was entitled. Manitowoc did not interfere with Tillotson's FMLA rights.

**C.**

Next, Manitowoc argues that Tillotson cannot establish a prima facie case of FMLA retaliation. To establish a prima facie case of FMLA retaliation through circumstantial evidence,[10] the familiar *McDonnell Douglas* burden-shifting framework is applied. Under that framework, the defendant bears the initial burden of establishing a prima facie case of retaliation by showing: (1) he was engaged in a statutorily protected activity; (2) Defendant knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal

[10] Tillotson argues that the record contains direct evidence of retaliation. If true, Tillotson's claims would be analyzed under a different standard. As discussed below, Tillotson has not provided direct evidence of retaliation.

connection existed between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir.2012). The primary focus of FMLA retaliation claims is "the motive of the employer." *Id.* at 512. That is, the focus is whether "the action was taken *because* the employee exercised, or complained about the denial of, FMLA-protected rights." *Id.* (emphasis in original).

**1.**

Tillotson asserts that several statements made by Manitowoc representatives constitute direct evidence of retaliation. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999).

In his deposition, Mr. Humphreys testified about a conversation he had with Mr. Wilzcak. In that conversation, Mr. Wilzcak discussed a comment Mr. Willoughby, the Vice President of Sales for Manitowoc Foodservice, Inc., made to Mr. Wilzcak during a recent telephone conversation. Mr. Wilzcak had just told Mr. Willoughby about Tillotson's medical issues and the work restrictions Dr. Vogel had imposed. According to Mr. Wilczak, Mr. Willoughby said "you can't have a sales guy who can't travel." Humphreys Dep. at 27. Mr. Humphreys then reminded Mr. Wilczak that the two of them had agreed with Tillotson that they "could make [the travel restrictions] work." *Id.* Mr. Wilczak told Mr. Humphreys that he had told Mr. Willoughby the same thing, but that Mr. Willoughby had replied, "we'll go with this for now." *Id.*

Mr. Humphreys also testified about a conversation he had with Trisha Hall, a human resources representative for Manitowoc Foodservices, Inc. According to Mr. Humphreys, he

called Ms. Hall after learning that Manitowoc was considering discharging Tillotson. He informed Ms. Hall about his confidence that Tillotson's medical restrictions could be accommodated. According to Mr. Humphreys, Ms. Hall responded: "You can't have a salesperson that can't travel." *Id.* at 30.

This is not direct evidence of retaliation. To begin with, Mr. Humphreys can only testify with first-hand knowledge about one of the statements. Mr. Willoughby's alleged comment to Mr. Wilzcak was not overheard by Mr. Humphreys. More importantly, even if the alleged statements occurred, they would not require a conclusion that Tillotson's work restrictions were a cause of his termination. Tillotson has provided no evidence which shows that Ms. Hall was involved in the decision to discharge Tillotson. She may have contributed to that decision, but that conclusion involves an inferential step. And even assuming that both Ms. Hall and Mr. Willoughby participated in the decision to discharge Tillotson, the conclusion that Tillotson was fired because of his work restrictions does not necessarily follow. Between the time Tillotson informed Manitowoc about his work restrictions and the time he was discharged, he was able to perform all his required duties. It is possible to conclude that Mr. Willoughby believed "you can't have a sales guys who can't travel" but still chose to fire Tillotson for completely unrelated reasons, given the fact that Tillotson *had* been traveling. Thus, the statements Mr. Humphreys testified about are not direct evidence of retaliation.

**2.**

Because Tillotson has not provided direct evidence of retaliation, the *McDonnell Douglas* burden-shifting framework applies. Manitowoc first asserts that Tillotson has not met his burden of demonstrating a prima facie case as to the first two elements because Tillotson never requested leave. But even though Tillotson did not request days off, he did provide enough

information for Manitowoc to realize that Tillotson had medical restrictions on his ability to work. As explained above, Manitowoc representatives met with Tillotson to discuss those limitations and indicated their willingness to accommodate him. Manitowoc knew that Tillotson had certain medical limitations and was also aware of the likelihood that Tillotson would require additional accommodations in the future. Those restrictions had not yet inconvenienced Manitowoc, but Tillotson had, at the very least, provided notice of his need for future accommodations. And, as discussed above, the FMLA does provide protections for employees which require a reduced schedule. Tillotson's request for a reduced schedule was thus statutorily protected conduct. Given the "minimal" burden of proof required to demonstrate a prima facie case, Tillotson has demonstrated a genuine issue of material fact regarding the first two elements. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Manitowoc further argues that Tillotson cannot show any causal connection between his discharge and his exercise of FMLA rights. However, Tillotson has presented sufficient circumstantial evidence that his work restrictions had a causal connection to his discharge to satisfy the prima facie burden. First, the comments by Mr. Willoughby and Ms. Hall already referenced indicate that individuals who were likely involved in the decision to discharge Tillotson knew that he had requested medical accommodations and believed that those restrictions negatively impacted Tillotson's ability to do his job. A reasonable jury could construe those comments as evidence of retaliatory motive. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355 (6th Cir. 1998) (holding that "discriminatory remarks" made by those who influenced an employment decision are relevant if the plaintiff challenges "the motive behind that decision").

Tillotson also argues that there is additional evidence of a causal connection between his request for changes to his schedule and his discharge. Specifically, Tillotson notes that Manitowoc initiated a separate reduction in force in April 2015. Tillotson was considered for discharge at that time, but was not laid off. Tillotson represents, and Manitowoc does not contest, that the decision-maker, Mr. Willoughby, had no knowledge of Tillotson's medical issues at that time. Tillotson asserts that there was no change in his circumstances between April 2015 and November 2015, other than his request for an accommodation. Accordingly, Tillotson believes that, because he was treated differently after he engaged in protected action, a retaliatory motived should be inferred. *See Cantrell v. Nissan N. Am. Inc.*, 145 F. App'x 99, 105–06 (6th Cir. 2005) ("[W]here an employer treats an employee differently after she asserts her rights under the ADA than before she had done so, a retaliatory motive may be inferred.").

"[T]emporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). But, if sufficiently close in time, temporal proximity between the evidence of discrimination and an adverse employment action can "raise a retaliatory inference." *Hegwood v. Pharmacia/Upjohn*, 985 F. Supp. 728, 734 (W.D. Mich. 1997). If significant time passes, the inference of retaliation is much weaker. *Id.* (finding that "passage of eight months is not strongly suggestive of retaliatory motive"). Here, Tillotson engaged in protected conduct as late as May 2015 (when he notified Manitowoc of his updated medical restrictions). The comment Mr. Willoughby allegedly made occurred sometime soon after that meeting. It is unclear when Ms. Hall commented negatively about Tillotson's restrictions, but that conversation apparently occurred after the November 2015 reduction in force selection process had already begun. At most, six months passed between the alleged discriminatory comments and Tillotson's discharge. More likely,

some of the alleged discrimination occurred closer in time. This evidence is not strongly suggestive of retaliation. But, in combination with the apparent change in Manitowoc's treatment of Tillotson, it is enough to demonstrate a genuine issue of fact regarding whether there was a causal connection between Tillotson's protected conduct and his discharge. Thus, Tillotson has shown a prima facie case of retaliation.

**3.**

Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action. *See Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012). To do so, the employer must "prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Id.*

Manitowoc asserts that Tillotson's employment was terminated because Tillotson was ranked as the weakest product sales manager at Delfield in terms of performance and potential. As discussed above, Tillotson had a "Medium Performance/Medium Potential" ranking, while the other three product sales managers had at least one "High" ranking. According to Mr. Willoughby's declaration, eight of Manitowoc Foodservice, Inc.'s, product sales managers were discharged in November 2015. Mr. Willoughby had been instructed to discharge one of the four Delfield product sales managers. Because Tillotson had the lowest ranking Delfield product sales manager on the rubric, Mr. Willoughby chose him for discharge.

Tillotson argues that Manitowoc has not met its burden of offering evidence of a legitimate non-discriminatory reason for the adverse employment action. Specifically, Tillotson asserts that, because no evidence has been provided detailing how the rubric scores were calculated, the rubric cannot provide a legitimate reason for the discharge. However, Tillotson

offers no legal authority that supports the assertion that Manitowoc must specifically prove each of the factors that may have contributed to the ultimate rationale for discharging Tillotson. Tillotson does not challenge the fact that the rubric identified him as the lowest ranked product sales manager at Delfield. Likewise, Tillotson does not contest Manitowoc's representations (supported by deposition testimony) that the rubric was created before Tillotson formally made his request for a reduced schedule. *See* Pl. Resp. at 20, ECF No. 31 (noting that the decision-maker had no knowledge of Tillotson's request for a modified schedule until after the April 2015 reduction in force and further noting that there was no evidence that employees were evaluated for discharge differently in April 2015 than November 2015).[11] Absent any evidence that the rubric was created or changed after Tillotson engaged in protected conduct, the rubric is sufficient to satisfy Manitowoc's burden of providing a legitimate, nondiscriminatory reason for the employment action.

**4.**

Because Manitowoc has articulated a legitimate reason for its action, the burden of production shifts back to Tillotson to demonstrate that Manitowoc's reason is pretextual. The plaintiff may "rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination," under the familiar tripartite test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). *Donald*, 667 F.3d at 762. Tillotson bears the "burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him.'" *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th

[11] The rubric was created during Defendant's annual talent assessment process. Although neither party has presented evidence regarding when, exactly, that process occurred, it seems reasonable to conclude that it occurred around the end of the previous year. Tillotson provides no evidence that the rubric was created or changed after he notified Defendant of his travel restrictions.

Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003)). "[A]s long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001).

In attempting to meet his burden, Tillotson again asserts that the lack of details regarding how Tillotson's ranking on the rubric was calculated demonstrates that the proffered reason for discharge was pretextual. But even if Tillotson could show that he was erroneously ranked so low, he has not shown that Manitowoc believed the rubric was inaccurate. Absent evidence showing that Manitowoc knew the ranking was erroneous, the company would be protected by the honest belief rule.

Tillotson further argues that the asserted bases on which the rubric was created—specifically, "sales targets and feedback from customers and reps . . . [as well as] future performance/actions, focusing on whether the individual has been able to readily establish a rapport with customers and reps and solidify business relationships"—are wholly subjective. Willoughby Decl. at 2. Courts have expressed concern about employers justifying potentially discriminatory employment decisions by relying on subjective criteria. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000) ("[A] plaintiff can not ultimately prove discrimination merely because his/her employer relied upon highly subjective qualities (i.e. 'drive' or 'enthusiasm') in making an employment decision. However, just as use of such criteria does not establish discrimination, cloaking such criteria with an appearance of objectivity does not immunize an employment decision from a claim of discrimination."); *Rowe v. Cleveland Pneumatic Co., Numerical Control*, 690 F.2d 88, 93 (6th Cir. 1982) ("[I]n some circumstances,

employment decisions may be made on the basis of such subjective criteria, any procedure employing such subjective evaluations will be carefully scrutinized in order to prevent abuse."). *See also Conner v. State Farm Mut. Auto. Ins. Co.*, 273 F. App'x 438, 443 (6th Cir. 2008).

Here, some of the criteria used to score the rubric do depend on subjective evaluations, but others do not. For example, whether a product sales manager met "sales targets" would presumably be an objective, numbers-based inquiry. Evaluating feedback from customers and representatives certainly involves some subjectivity, but determining whether feedback is generally negative or positive is not a hopelessly subjective task. Still, using subjective criteria when making employment decisions is problematic because it can be difficult after the fact to parse the employer's true intentions. For that reason, the Third Circuit's approach—which holds that use of subjective criteria for employment decisions neither establishes nor forecloses discrimination—is sensible. Manitowoc's rubric does not rely wholly on subjective criteria. Thus, it provides some minimal evidence that Manitowoc's reliance on the rubric was not a pretext for discrimination. However, given the subjective nature of most of the factors used to create the rubric, it does not foreclose a finding of pretext. Rather, Tillotson must produce additional evidence indicating that Manitowoc's purported reliance on the rubric was simply pretextual.

Tillotson has not met his burden of demonstrating pretext. Besides his arguments related to the subjectivity of the rubric, Tillotson also reiterates the argument he previously made regarding causation. For essentially the same reasons already stated, that evidence falls short of creating a genuine issue of material fact. Tillotson has provided no evidence which indicates that the rubric was created or changed after Tillotson notified Manitowoc of his need for travel restrictions. Rather, the fact that the rubric was created during the annual talent assessment

process suggests that the rubric was created in early 2015. If the rubric, which identified Tillotson as the lowest performing product sales manager at Delfied, was created before Tillotson requested a medical accommodation, then reliance on the rubric can hardly be pretext for unlawful discrimination. Even if Mr. Willoughby and Ms. Hall made the alleged comments, Manitowoc could have honestly and independently relied solely on the rubric to select Tillotson for discharge.

In short, Manitowoc has proffered a legitimate, nondiscriminatory reason for Tillotson's discharge, and Tillotson has not met his burden of demonstrating that the reason was pretext for discrimination. The rubric might have been partially created using subjective criteria, but subjectivity alone is not, without more, evidence of pretext. Likewise, there is some evidence of discriminatory statements in the record, but there is no evidence that those statements were made prior to the creation of the rubric. In fact, there is no evidence that the Manitowoc even knew about Tillotson's travel restrictions before the rubric was created. At the summary judgment stage, the party bearing the burden of proof must substantiate their claims and allegations with evidence. Tillotson is not entitled to proceed to trial based on mere speculation and conclusory representations. Rather than demonstrating, through "concrete evidence" that a genuine issue of material fact exists, Tillotson has produced no more than a mere scintilla of evidence of retaliation. *See Hatten v. Consol. Rail Corp.*, 860 F. Supp. 1252, 1254 (W.D. Mich. 1994). Because Tillotson has not carried his burden of demonstrating a genuine issue of fact regarding whether Manitowoc's reason for discharging him was pretextual, summary judgment will be granted for Manitowoc on the retaliation claim.

**D.**

Tillotson's only remaining claim is an age discrimination claim under state law. Because Tillotson's federal claims will be dismissed on the merits, Tillotson's related state law claim will be dismissed without prejudice. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claims if they form part of the same controversy as the federal claim. *See* 28 U.S.C. § 1367(a). A federal court may decline to exercise supplemental jurisdiction over a claim if:

> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002). However, the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id*. at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its supplemental jurisdiction. Plaintiffs' supplemental state law claims will therefore be dismissed without prejudice.

**E.**

Tilloton's federal claims will be dismissed with prejudice and his state claims will be dismissed without prejudice. Because all of Tillotson's claims will be dismissed, Manitowoc's pending motion for a protective order will be denied as moot. For the same reason, Tillotson's motion to adjourn trial will be denied as moot.

**IV.**

Accordingly, it is **ORDERED** that Defendant The Manitowoc Company, Inc.'s, motion for summary judgment, ECF No. 29, is **GRANTED.**

It is further **ORDERED** that Count 1 of Plaintiff Tillotson's Amended Complaint, ECF No. 4, is **DISMISSED with prejudice**.

It is further **ORDERED** that Count 2 Plaintiff Tillotson's Amended Complaint, ECF No. 4, is **DISMISSED without prejudice**.

It is further **ORDERED** that Defendant The Manitowoc Company, Inc.'s, motion for a protective order, ECF No. 32, is **DENIED as moot.**

It is further **ORDERED** that Plaintiff Tillotson's motion to adjourn trial, ECF No. 40, is **DENIED as moot.**

Dated: February 3, 2017

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 3, 2017.

s/Kelly Winslow for
MICHAEL A. SIAN, Case Manager